IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MARIA F. PARSON,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 4:16-cv-04099-JEH |

**Order and Opinion**

Now before the Court are the Plaintiff, Maria Parson's, Motion for Summary Judgment (D. 10)[1] and the Commissioner's Motion for Summary Affirmance (D. 14). Both parties have provided supporting Memoranda thereto. (D. 11, 15). For the reasons set forth, *infra*, this Court REVERSES the Commissioner's Decision, GRANTS Parson's Motion for Summary Judgment (D. 10), DENIES the Commissioner's Motion for Summary Affirmance (D. 14), and REMANDS for further proceedings consistent with this Order and Opinion.[2]

**I**

On June 5, 2012, Parson filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) alleging disability beginning on April 7, 2012. Her claims for benefits were denied initially on August 17, 2012, and upon reconsideration on February 16, 2013. On March 25, 2013, Parson filed a request for a hearing on her application for Social Security benefits. Parson appeared at the hearing before the Honorable David W. Thompson (ALJ) on July 2, 2014, via

---

[1] Citations to the Docket in this case are abbreviated as "D. __."
[2] The undersigned presides over this case with the consent of all parties. (D. 9).

video. She was represented by an attorney. Following the hearing, the ALJ denied Parson's claim on November 21, 2014. The Appeals Council denied Parson's request for review on April 21, 2016, making the ALJ's Decision the final decision of the Commissioner. 20 C.F.R. § 404.981. Parson filed the instant civil action, seeking review of the ALJ's Decision pursuant to 42 U.S.C. §§ 405(g), 1383(c) on May 31, 2016.

## II

At the time Parson applied for benefits, she was 27 years old. She was living in an apartment with her mother and eight year old son in Rock Island, Illinois. Parson has a high school education and completed one year of college courses. She has not worked since June of 2008. On the various SSA forms she submitted, Parson indicated that she suffers from epilepsy.

At the hearing before the ALJ, Parson testified that her epileptic seizures occur approximately three times a month. She said her last seizure was about 10 days prior to the hearing. Parson stated that each seizure lasts anywhere from 15-30 minutes, with lingering after effects that last approximately the same amount of time. Afterwards, she asserts that she is back to her normal self. (D. 5 at pg. 58).

Parson's epilepsy is largely controlled by medication, when she takes it as directed. At the time of the hearing, she was on several medications and had been so for approximately one year. Parson testified that the medications were effective and gave her no negative side effects. She said she had been to the emergency room six times for seizures in 2014. Parson also spent nine months in an inpatient mental health facility, getting out in May 2014—roughly two months prior to the hearing. She indicated that she struggles with depression as a result of her seizures, but did not provide much detail on how the two conditions are connected.

Parson said Kirk Witherspoon, Ph.d., a licensed forensic and clinical psychologist, diagnosed her with schizoaffective disorder. She testified that her psychiatric problems and seizures make her tired and unable to work. Parson estimated that she would miss work approximately eight times a month due to tiredness, and she could not do any of her past jobs as a result of her condition.

Vocational Expert, Alfred Walker, also testified at Parson's hearing. The ALJ and Parson's counsel agreed that there was not enough evidence to establish any past relevant work history for Parson. *Id.* at pg. 68. In answering questions from the ALJ, Walker opined that an individual of Parson's age, experience, and education, could find jobs in the economy with the following restrictions: (1) at most, occasional use of ladders no more than six feet tall; (2) no use of ropes; (3) no use of scaffolds; (4) avoiding concentrated exposure to fumes, odors, dust and gases; (5) avoiding even moderate exposure to unprotected heights and unprotected moving machinery; and (6) no operating motorized vehicles. Walker said that, even if the same individual had periods of symptom exacerbation where they had moderate limitations in concentration, persistence, and/or pace, limiting them to jobs that do not require complex or detailed work (those capable of being learned in 30 days or less), it would have no effect on the number of jobs available.

Walker provided the ALJ with samples of occupations that fall into this category including medium, light, and sedentary jobs. He also testified to the relevant statistics on their availability, both nationally and regionally. His list was a representative sample, not an exhaustive one. Walker stated that if an employee were to miss four or more days of work per month—or anything above eight to ten absences per year due to sickness—they would be precluded from competitive employment. He also said that if an employee were 85% or less productive on the job, that would prevent them from maintaining competitive employment. Walker

3

stated that his testimony was consistent with the Dictionary of Occupational Titles and/or his professional and personal experience.

In closing, Parson's counsel admitted there were some discrepancies between Parson's past intellectual performance and the more current language used by medical personnel indicating she was intellectually disabled. Parson had graduated from high school and briefly attended college, which was not indicative of someone with her then-current assessed intellectual acuity. As a result, the ALJ ordered a post-hearing psychological evaluation by Witherspoon. *Id.* at pp. 73-74.

## III

In his Decision, the ALJ determined that Parson had the severe impairments of a history or seizure activity, schizoaffective disorder, borderline intellectual functioning, asthma, and obesity (20 CFR 404.1520(c) and 416.920(c)). (D. 5 at pg. 17). The ALJ crafted the following Residual Functional Capacity for her:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: occasional climbing ladders up to 6 feet tall; no climbing ladders over 6 feet tall, and no climbing ropes or scaffolds; must avoid concentrated exposure to odors, fumes, dusts, and gases; and must avoid even moderate exposure to unprotected height and unprotected moving machinery; and must not operate motor vehicles; and, due to all of the individual's mental impairments and symptoms combined, the individual may, during times of symptoms [*sic*] exacerbations, have moderate limitations in concentration, persistence and/or pace when attempting complex or detailed tasks, so the individual is limited to jobs that do not require complex or detailed job processes, and little in the way of change in job process from day to day, so they can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks easily resumed after momentary distraction.

*Id.* at pg. 22. In reaching that finding, the ALJ recounted Parson's testimony at the hearing regarding her condition. Following protocol, he determined there was a

4

medical impairment reasonably expected to produce her symptoms. The ALJ ultimately concluded that, in "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." *Id.* at pg. 31. Before reaching this conclusion, the ALJ engaged in a lengthy analysis of the evidence pertaining to both Parson's seizures and her schizoaffective disorder.

In the ALJ's review of Parson's history of seizure activity, he noted that "there is evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application." *Id.* at pg. 23. According to the medical records, Parson's seizures were characterized by medical staff as "'under good control as long as she takes her medications.'" *Id.* The ALJ also cited multiple instances where Parson admittedly or apodictically was not taking her seizure medication before having a seizure. She was outright dishonest about it at times.

As for Parson's schizoaffective disorder, before engaging in a similarly detailed review of the relevant medical records, the ALJ concluded that "the record also reveals that the treatment has been generally successful in controlling those symptoms." *Id.* at pg. 25. He noted Witherspoon's diagnosis of Parson as having "'moderate to severe,' 'depressive type' schizoaffective disorder." *Id.* at pg. 26. Notably, the ALJ highlighted the fact that Parson's condition on the day she was admitted for inpatient services, and to be assessed for fitness to stand trial for criminal charges, stood in stark contrast to her condition the very next day. Initially, she "presented as disheveled with poor hygiene and grooming, mumbled incoherently at times, had a constricted effect, and frequently did not answer questions[.]" *Id.* However, the ALJ further found that "treatment notes

5

documented the claimant as remarkably different the following day, recording her as cooperative, sociable, neat/clean, speaking at a normal pace, having goal-directed/logical thought, an affect in the 'neutral' and/or/to the 'normal range,' a 'euthymic/normal' mood, and having normal concentration and attention and memory." *Id.* Parson's condition remained stable until her discharge in May 2014. At subsequent appointments, including one in August—after the hearing—she denied having any mental or emotional difficulties.

The ALJ also noted that at her post-hearing appointment, Witherspoon administered an IQ test to Parson. Witherspoon estimated Parson's IQ score to be 68 and diagnosed her with a "'mild' intellectual disability." *Id.* at pg. 27. The ALJ found, however, that "the claimant's low scores in her educational assessment were considered questionable due to possible lingering postical effects from a seizure and her low IQ scores from August 2014 are [not] [*sic*] comparable with any prior IQ testing, nor are they consistent with the claimant's educational history which included some college coursework." *Id.* at pp. 27-28. The ALJ concluded that:

> As for the opinion evidence, the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.' … Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision).

*Id.* at pg. 28.

In closing, the ALJ stated:
> [B]ased on a review of the medical evidence of record, as well as the claimant's testimony at the hearing and the record as a

6

> whole, the undersigned finds the evidence contained in the record does not support the claimant's allegations of totally incapacitating symptoms. She has retained the capacity to perform all exertional levels of work, with significant exertional limitations, throughout the period under consideration. The claimant has not demonstrated that the medical evidence supports greater limitation than in the Residual Functional Capacity above, and the undersigned gives the claimant all benefit of reasonable doubt.

*Id.* at pg. 30.

## IV

Parson argues that the ALJ erred because: (1) his RFC finding was not supported by substantial evidence and (2) his finding that she does not meet or equal any listed impairment is not supported by substantial evidence.

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Establishing disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental

impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. "A negative answer at any point, other than at step 3, stops [the] inquiry and leads to a determination that the claimant is not disabled." *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. In the instant case, Parson claims the ALJ erred at Step Five.

8

**A**

First, the Court addresses Parson's argument that the ALJ's finding that she does not meet or equal any listed impairment is not supported by substantial evidence. (D. 11 at pp. 28-36). Specifically, she claims that because the ALJ never gave an opinion about medical equivalence to listings 12.02 and 12.05, his finding is unsupported. The Commissioner asserts that the ALJ reasonably found that Parson did not meet or equal either listed impairment. (D. 15 at pp. 12-18).

The ALJ considered Listing 12.02 (organic mental disorders) and Listing 12.05 (intellectual disability) in making his ruling. (D. at pp. 19-21). His finding on these listings is supported by substantial evidence. After detailing the requirements of each listing, the ALJ cited evidence in the record—or a lack thereof—in support of his finding that Parson did not meet the specified standard.

In order to meet the criteria for Listing 12.02, Parson must demonstrate that she has "[p]sychological or behavioral abnormalities associated with a dysfunction in the brain." C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02. "History and physical examination or laboratory tests [must] demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." *Id.* As the Commissioner highlights, Parson "does not explain what organic mental disorder caused her significant abnormalities." (D. 15 at pg. 17). As such, Parson's argument is unsuccessful.

A similar analysis applies to Parson's Listing 12.05 argument. Under 12.05, Parson is first required to demonstrate that she is intellectually disabled, defined as having "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports the onset of the impairment before age 22." C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05; *See also Novy v. Astrue*, 497 F.3d 708, 709

(7th Cir. 2007) (discussing how this definition from the introductory paragraph of section 12.05 "seem[s] intended to limit coverage to an innate condition, rather than a condition resulting from a disease or accident in adulthood.") (internal citation omitted); *Markle v. Barnhart*, 324 F.3d 182, 188-89 (3rd Cir. 2003). Parson has failed to demonstrate this element of the Listing, which is a necessary prerequisite to any analysis of the remaining factors in the Listing, including that of an IQ score below 70.

Substantial evidence supports the ALJ's denial of disability benefits on this issue because Parson did not meet the initial requirements of Listing 12.05. She only began to have intellectual difficulties, as evidenced by her low IQ score, relatively recently—after reaching the age of 22. The ALJ noted that Parson finished high school and briefly attended college, indicating that she did not have a deficit in adaptive functioning during her developmental period, as required for a finding of an intellectual disability under Listing 12.05. Likewise, according to the medical records, Parson frequently indicated that she was capable, most of the time, of communicating effectively. Thus, substantial evidence supports the ALJ's finding that Parson did not have the necessary deficits in adaptive functioning to meet the criteria under Listing 12.05.

Both Listings require Parson to satisfy specific criteria in order to be found to have a functional limitation caused by a mental impairment. She has been unable to demonstrate that she meets this criteria. The ALJ cited the record to establish that Parson was unable to qualify as disabled under either Listing. Thus, the Court concludes that the ALJ reasonably found Parson did not meet the requirements. On the contrary, the record reflects that the ALJ sufficiently considered Parson's seizures in combination with her mental impairments, and the substantial evidence supports his determination that Parson did not meet or

equal Listing 12.02 or Listing 12.05. Accordingly, Parson's argument on this issue fails on the merits.

B

Parson also claims that the ALJ erred in "fail[ing] to consider [her] mental status as an alternative explanation for her non-compliance before making an adverse finding about her credibility." *Id.* at pp. 24-25. Although Parson immediately cites case law after this statement, *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011), this citation does not support the proposition asserted. *Jelinek* does, however, highlight the fact that in some instances, ALJs have a duty to address the impact of a claimant's mental limitations on their disability. *Id.* at 813-14. Indeed, such is the case here.

Parson has a lengthy history of emergency room visits in the wake of her seizures. The frequency and severity of her seizures is not disputed. By Parson's calculation, her seizures occur roughly three times per month. At the time of her hearing, Parson's last seizure occurred roughly 10 days prior. More importantly, on July 2, 2014, she estimated that she had already been to the emergency room six times as a result of seizures. The majority of that time, until May, she was in an inpatient mental health facility.

Parson's medical history, specifically the frequency of her seizures, currently renders her disabled. The ALJ's non-disability finding rests squarely on the logic that if Parson would take her seizure medication consistently, she would not experience seizures with as much frequency. It remains to be seen, however, why Parson did not take her medication consistently. Poverty, for example, can be a legitimate reason not to take medications that will not preclude a disability finding. *See, Buchholtz v. Barnhart*, 98 Fed.Appx. 540, 545-46 (7th Cir. 2004) (noting this finding in three other circuits).

As discussed previously, the numerous incidents where Parson reportedly neglected to take her medication figured prominently in the ALJ's Decision. In 2011, Parson acknowledged that her seizures are "under really good control as long as she takes her medications." (D. 5-1 at pg. 94). After a seizure in November 2012, she reported that she had not taken her seizure medication that day or the day before. *Id.* at pg. 124. In April 2013, her son reported that she had not taken her medication on time the day she had a seizure. *Id.* at pg. 464. Later that month, Parson informed emergency room staff that she was taking her seizure medication. *Id.* at pp. 137-38. Her labs indicated, however, that she was not. *Id.*

In June 2013, medical staff described Parson as "non-compliant with medications." *Id.* at pg. 262. Later that month, after a seizure, she indicated that she had been out of medication for two days. (D. 5-2 at pg. 112). While incarcerated in July 2013, jail staff told medical providers that Parson had not taken her seizure medication for three days. *Id.* at pg. 86. Parson also self-reported improvement when compliant with her prescribed medication.

This evidence, all discussed by the ALJ in his Decision, allows him to reasonably doubt whether Parson's seizure disorder was as limiting as she claimed. Medications are a factor to consider when evaluating medical impairments. 20 C.F.R. § 404.1529(c)(3)(iv). A diagnosis and the presence of symptoms does not require an ALJ to find that a claimant suffers a disabling impairment. *See e.g., Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007). This is especially true when, as is the case here, medical evidence in the record suggests that the claimant's "symptoms are largely controlled with proper medication and treatment." *Id.* (citing *Barrientos v. Sec'y of Health & Human Servs.,* 820 F.2d 1, 2 (1st Cir. 1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).

However, in his post-hearing examination, Whitherspoon concluded that Parson had difficulty handling complex instructions, no limitation in her ability to

remember and handle simple instructions, and mild limitations in her ability to execute simple instructions. (D. 5-2 at pg. 212). Ultimately, he concluded that Parson could not multitask. *Id.* In the wake of such findings, the ALJ cannot presume Parson's intellectual difficulties had no impact on her ability to follow her doctor's instructions regarding prescription medication. The ALJ's RFC was partially based on the limitations detailed in Whitherspoon's post-hearing examination. These restrictions suggest that Parson may have disability-related reasons for not taking her seizure medication regularly. This possibility must be eliminated before the Commissioner can deem that she is not disabled.

Although the ALJ did consider Parson's subjective claims of symptoms and some evidence that undermines her complaints, such as Parson's claims that her seizure medication works when she takes it and her documented history of not taking it consistently, the ALJ should have taken his analysis one step further. While, generally speaking, if a claimant's impairment can be controlled by treatment or medication, that impairment cannot be considered disabling, 20 C.F.R. §§ 404.1530(b), 416.930(b), the ALJ also must determine whether she failed to take her medication "without a good reason[,]" the only allowable exception to this rule. *Id.*

Given the current record before the Court, there is no way to determine why Parson did not take her medication at regular intervals. The ALJ should have, at a minimum, evaluated what effect Parson's psychological impairments and borderline intellectual functioning had on her ability to properly treat her seizure disorder. *See, e.g. Lucas v. Sullivan*, 918 F.2d 1567, 1573-74 (11th Cir. 1990) (requiring same). Without this inquiry the record is not sufficiently developed for the Court to determine if Parson failed to take her medication without good reason. As such, the case must be remanded. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (noting that when a Commissioner's decision lacks adequate

discussion of the issues, the case will be remanded), *citing Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir.2005); *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir.2003); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

On remand, the ALJ needs to determine what impact, if any, Parson's mental impairments had on her inability to take her seizure medications regularly. To date, the ALJ has failed to account for this factor in his Decision. It is imperative to the ultimate ruling on Parson's disability that the ALJ assess whether her documented declining mental ability had an impact on her sporadic medication habits. After all, Parson's failure to follow her prescription regimen may be directly attributed to her impairments, rendering her disabled. On remand, the ALJ is directed to explore this issue and provide an adequate analysis.

## V

For the reasons set forth, *infra*, this Court REVERSES the Commissioner's decision, GRANTS Parson's Motion for Summary Judgment (D. 10), DENIES the Commissioner's Motion for Summary Affirmance (D. 14), and REMANDS to the Commissioner for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk's Office is hereby directed to enter Judgment in favor of the Plaintiff and against the Defendant. This matter is now terminated.

*It is so ordered.*

Entered on May 18, 2017.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE